### In re GABAPENTIN PATENT LITIGATION

MDL No. 1384.

Nos. 00–2931(JCL), 00–3522(JCL), 00–4168(JCL), 00–4589(JCL), 00–6073(JCL), 01–0193(JCL), 01–0611(JCL), 01–2194(JCL), 01–1537(JCL).

United States District Court, D. New Jersey.

Aug. 25, 2005.

David S. Copeland, Leora Ben–Ami, Stephen J. Elliott, Kaye Scholer, LLP, Constantine L. Trela, Leisa Smith, Hugh C. Barrett, Fitzpatrick, Cella, Harper, Scinto, Esqs., New York City, John J. Francis, Jr., Drinker Biddle & Reath, Florham Park, NJ, Lisa A. Schneider, Sidley & Austin, Chicago, IL, for Plaintiffs/Counter–Defendants.

Arnold B. Calmann, Saiber, Schlesinger, Satz & Goldstein, LLC, Allyn Zissel Lite, Michael E. Patunas, Lite, Depalma, Greenberg and Rivas, LCC, Newark, NJ, Patrick J. Hughes, Connell Foley, LLP, James E. Cecchi, Lindsey H. Taylor, Carella Byrne Bain Gilfillan Cecchi Stewart & Olstein, PC, Roseland, NJ, William L. Mentlik, Lerner, David, Littenberg, Krumholz & Mentlik Esqs., Westfield, NJ, Donald Horowitz, Hackensack, NJ, Stanley H. Lieberstein, St. Onge Steward Johnson & Reens LLC, Stamford, CT, Neil S. Cartusciello, Mendham, NJ, Hugh L. Moore, Deanne M. Mazzochi, Keith D. Parr, Scott B. Feder, Lord, Bissell & Brook, William Andrew Rakoczy, Paul J. Molino, Rakoczy Molino Mazzochi Siwik LLP, Richard P. Beem, Beem Patent Law Firm, Louis Anthony Lehr, Chicago, IL, for Defendants/Counter Claimants.

### MEMORANDUM AND ORDER

LIFLAND, District Judge.

Plaintiffs Pfizer, Inc., Warner–Lambert Co., and Gödecke Aktiengesellschaft (collectively, "Warner–Lambert") brought suit against Defendants Purepac Pharmaceutical Co., Faulding Inc., Apotex Corp., Apotex, Inc., TorPharm, Inc., Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., Eon Labs Manufacturing, Inc., Zenith Laboratories, Inc., Zenith Goldline Pharmaceuticals, Inc., and Ivax Corporation (collectively, "Defendants"), alleging infringement of U.S. Patent No. 6,054,482, entitled "Lactam–Free Amino

Acids" (" '482 patent").[1] Before the Court is the Motion of Defendants Purepac Pharmaceutical Co. and Faulding Inc. and a Joint Motion filed on behalf of the other Defendants for Summary Judgment Invalidating the Claims of the '482 Patent for failure to comply with the written description requirement of 35 U.S.C. § 112, ¶ 1. For the reasons set forth herein, the Motions will be denied.

## BACKGROUND

Neurontin® is sold by Warner–Lambert as an aid in the treatment of epileptic seizures and other cerebral disorders. The active ingredient in Neurontin® is a chemical compound called gabapentin. The chemical makeup of gabapentin allows the molecule, under certain conditions, to undergo an internal chemical reaction that results in a new compound called "gabapentin lactam." Gabapentin lactam, which is more than twenty-five times as toxic as gabapentin, actually causes rather than prevents seizures. Given the serious risks posed by gabapentin lactam, Warner–Lambert scientists sought to minimize its formation. They did so by way of a process ultimately disclosed in the '482 patent.

### A. Development of Neurontin

When making a drug to market commercially, pharmaceutical companies generally prefer to use a "salt" of a drug in order to promote good stability and solubility, and to ensure that it is not irritating at the site of administration. A "salt" is formed as a result of the reaction between an acid and a base wherein a hydrogen ion from the acid is transferred to the base. Drugs that are "basic," like gabapentin, form a salt with hydrochloric acid (HCl). Upon discovering that the hydrochloride salt of gabapentin turned to lactam more quickly than gabapentin itself, Warner–Lambert scientists turned their attention from using the hydrochloride salt to using "free" gabapentin.

Gabapentin hydrochloride salt can be converted back to the neutral form of gabapentin through a process called ion exchange. Ion exchange involves a solution of gabapentin hydrochloride in water being passed through a column of ion exchange resin prepared in the "basic" form. Bartlett Decl. ¶ 15. The hydrochloric acid (HCl) stays on the column while the neutral form of gabapentin comes out the bottom. Id. Removal of HCl from gabapentin hydrochloride salt via ion exchange is a very efficient process. In a sample that has been prepared from gabapentin hydrochloride by ion exchange, there is a one-to-one correspondence between the number of chloride ions and the number of gabapentin molecules that remain in the acidic form.[2] Bartlett Decl. ¶ 17.

### B. The '482 Patent

The '482 patent includes eleven claims-three independent claims (1,3,7) and eight dependent claims. Every claim in the '482 patent includes the limitation that gabapentin have "less than 20 ppm" of an anion of a mineral acid or that an anion of a

---

1. Warner–Lambert filed separate patent infringement actions against multiple generic drug manufacturers. The Judicial Panel on Multidistrict Litigation directed that all such actions be consolidated before this Court for coordinated pretrial proceedings. This Motion pertains to the "first-wave" defendants. There are also "second-wave" and "third-wave" defendants, sued by Warner–Lambert after close of discovery for first-wave defendants.

2. This background section is included for informational purposes and because the Court believes that it informs Warner–Lambert's position. The Court is aware that Defendants dispute and/or challenge this information as irrelevant to the issues presented.

mineral acid does "not exceed 20 ppm." An anion is a negatively charged ion. Mineral acids include nitric, sulfuric, and hydrochloric acids. An anion of hydrochloric acid, for example, is chloride.

Claims 1 through 6 of the '482 patent are process claims. '482 patent, col. 6, l. 55 to col. 8, l. 28. Independent claim 1 concerns a process for making gabapentin. Claim 1 specifies that the gabapentin compound resulting from the process must contain "less than 20 ppm" of an anion of a mineral acid. '482 patent, col. 6, ll. 56–67; col. 7, ll. 1–20. Claim 2 depends from claim 1 and, accordingly, includes the "less than 20 ppm" limitation. *Id.* at col. 7, ll. 21–22. Claim 3, the next independent claim, concerns a process for making a pharmaceutical composition containing gabapentin. Claim 3 specifies that the anion of a mineral acid remaining in the gabapentin compound produced during the process must "not exceed 20 ppm." *Id.* at col. 7, ll. 23–57; col. 8, ll. 1–16. Claims 4, 5, and 6 depend from claim 3 and, therefore, include the "not exceed 20 ppm" limitation.

Claim 7 of the '482 patent, the only independent product claim, covers a pharmaceutical composition containing gabapentin:

7. A stable and pure pharmaceutical composition in unit dry medicinal dosage form consisting essentially of:

(i) an active ingredient which is gabapentin in the free amino acid, crystalline anhydrous form containing less than 0.5% by weight of its corresponding lactam and *less than 20 ppm of an anion of a mineral acid* and

(ii) one or more pharmaceutically acceptable adjuvants that do not promote conversion of more than 0.2% by weight of the gabapentin to its corresponding lactam form when stored at 25 C and an atmospheric humidity of 50% for one year.

*Id.* at col. 8, ll. 29–40 (emphasis added). Claims 8–11 depend from claim 7 and, therefore, incorporate all the limitations of claim 7, including the "less than 20 ppm" limitation.

The only reference in the written description of the '482 patent to a 20–ppm limitation is as follows: "The active material of formula (I) must be prepared as highly purified, nonderivatized hydrochloride by ion exchange. The proportion of remaining hydrochloride admixture should thereby not exceed 20 ppm. The same also applies to other mineral acids." *Id.* at col. 5, ll. 24–29.

Movants argue that as a matter of law, all claims are invalid because they are not supported by the written description, under either of the competing claim constructions asserted by the parties.

## STANDARD OF REVIEW

Summary judgment is a procedural tool that obviates the need for trial by identifying and disposing of groundless claims and defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Relief is warranted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To resist, the adverse party must set forth specific facts that demonstrate the existence of a genuine issue for trial and may not rest on bare allegations or unsubstantiated defenses. Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment. Once the proponent discharges its Rule 56(c) duty, the burden shifts to the adverse party to show that material facts are genuinely controverted. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Materiality and genuineness are the touchstones of summary judgment law. A dispute is genuine only if the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. To determine whether the proofs create a jury question, the Court must take into account the apposite evidentiary burden. *Anderson*, 477 U.S. at 254–55, 106 S.Ct. 2505. If the proofs presented would permit a jury applying the governing evidentiary standard to find for the adverse party, then a genuine factual dispute exists. *Id.* at 255, 106 S.Ct. 2505. Whether those disputed facts are material depends on the applicable substantive law. *Id.*

Because summary judgment involves a pretrial adjudication on the merits, the adverse party enjoys the benefit of various procedural protections. For example, the Court must view the evidence in the light most favorable to the adverse party and accord that party the benefit of all legitimate inferences. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. Moreover, the Court may not take credibility issues from the fact-finder. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

### DISCUSSION

 A patent is presumptively valid. 35 U.S.C. § 282. One seeking to overcome the presumption of validity must produce clear and convincing evidence to the contrary. *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed.Cir.2002).

The presumption of validity extends to assertions of invalidity concerning the written description requirement, as are made here. *See Ralston Purina Co. v. Far–Mar–Co.*, 772 F.2d 1570, 1573–74 (Fed.Cir. 1985). The written description requirement, codified at 35 U.S.C. § 112, provides as follows:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112, ¶ 1. This requirement serves to prevent an inventor from overreaching and enlarging the scope of his or her invention, as defined by the claims. *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1327 (Fed.Cir.2000). The written description requirement focuses on the disclosure in the original patent application. *See Lockwood v. American Airlines*, 107 F.3d 1565, 1571–72 (Fed.Cir.1997). Information that arises after filing of the patent application may not be used to cure omissions or defects in the written description of the invention. *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1346 (Fed.Cir.2000).

 Satisfaction of the written description requirement is generally a factual determination to be made on a case-by-case basis. *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562 (Fed.Cir.1991). To satisfy the written description requirement, "the patent specification must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir.1998) (internal quotations and citation omitted). In other words, "one skilled in

the art, reading the original disclosure, must immediately discern the limitation at issue in the claims." *Purdue Pharma L.P.*, 230 F.3d at 1323.

## A. Parties' Arguments

Defendants argue that the material facts are beyond reasonable dispute in that the plain language of the '482 patent provides clear and convincing evidence that the written description does not properly and sufficiently support the claims, however they are interpreted. The argument goes that each independent claim of the '482 patent (and thus every claim of the patent) includes the limitation that the gabapentin must contain less than "20 ppm" of an "anion of a mineral acid." However, the '482 patent's written description does not describe gabapentin containing less than "20 ppm" of an "anion of a mineral acid."

Warner–Lambert counters that the written description does support the "less than 20 ppm of an anion of a mineral acid" limitation in the claims. Warner–Lambert maintains that the specification and claims need not use the same words for there to be support for the claims. *See Application of Smith*, 481 F.2d 910, 914 (Cust. & Pat.App.1973) ("[C]laimed subject matter need not be described *in haec verba* in the specification in order for that specification to satisfy the description requirement.").

The relevant inquiry is factual and focuses on whether one skilled in the art would understand the supporting language in the specification to describe the same inventive concept found in the claims. As set forth below, Warner–Lambert points to unresolved factual questions, generated by conflicting expert opinions, that preclude summary judgment of invalidity.

## B. Analysis

For reasons set forth in the Court's Memorandum and Order denying the Motion of Purepac Pharmaceutical Co. and Faulding Inc. for summary judgment of noninfringement based on the '482 patent's 20–ppm limitation, the Court has construed claim 7, clause (i) of the '482 patent to pertain to anions derived from a mineral acid. In doing so, the Court rejected the competing construction urged by Defendants, *i.e.*, that "anion of a mineral acid" refers to chloride anions regardless of their source. The Court now turns to whether the written description requirement supports the claims of the '482 patent, as construed.

■ The Court concludes that disputed issues of material fact preclude summary judgment on invalidity for failure to comply with the written description requirement. That expert affidavits conflict concerning the written description requirement has been held sufficient to preclude summary judgment. *See, e.g., SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1336–37 (Fed.Cir.1999).

Defendants contend that the disclosure of the '482 patent does not describe or support the "20 ppm of an anion of a mineral acid" claim limitation because neither the written description, nor the original patent application, ever describes or mentions that the gabapentin compound should contain less than 20 ppm of an anion of a mineral acid. The only mention of "20 ppm" in the written description is as follows: "The proportion of remaining hydrochloride admixtures should thereby not exceed 20 ppm."[3] '482 patent at col. 5, ll.

---

3. The Court notes a disconnect in that the phrase "does not exceed 20 ppm" in the written description and the phrase "less than 20 ppm" in claim 7 denote slightly different ranges. The former presumably includes 20 ppm and the latter does not.

24–29. "Hydrochloride admixtures," according to Defendants, refers to the mixture of gabapentin hydrochloride within the bulk gabapentin. Defendants rely, in part, on the testimony of Warner–Lambert's expert, Dr. Paul A. Bartlett, that "HCl would be present as gabapentin hydrochloride." Bartlett Dep. at 155:23–156:10. From that Defendants argue that the written description teaches that the amount of gabapentin hydrochloride within the gabapentin should not exceed 20 ppm, as measured relative to the amount of gabapentin.

Defendants go on to explain that a gabapentin hydrochloride molecule differs significantly from a chloride ion in both structure and weight. DeShong Decl. ¶¶ 8–9. A chloride ion is a single atom of the element chlorine that has a negative charge. Id. ¶ 8. A chloride ion weighs 35.46 atomic mass units. Id. Gabapentin hydrochloride includes chloride and other components or constituents. Id. ¶ 9. A gabapentin hydrochloride molecule weighs 207.7 atomic mass units. Id. Since chloride constitutes only part of gabapentin hydrochloride, 20 ppm of gabapentin hydrochloride corresponds to only 3.4 ppm of chloride. Id. ¶ 10. Thus, Defendants argue that the written description does not support a 20–ppm chloride limit in the claim. Amundson Decl. Ex. 1, col. 5, ll. 18–29; DeShong Decl. ¶¶ 17–22.

Warner–Lambert maintains that one skilled in the art would understand the limitation in the claims to mean the same as the 20–ppm limitation in the specification. According to Dr. Bartlett, one skilled in the art would understand that a "hydrochloride admixture" in a sample of gabapentin is quite different in meaning from "gabapentin hydrochloride." Ratliff Decl., Ex. 15, Rebuttal Rpt. of Dr. Bartlett at 7. The reasoning goes that "gabapentin hydrochloride" is a distinct chemical entity comprised of exactly one molecule of HCl in combination with one molecule of gabapentin. Id. In contrast, an admixture is a mixture of one material within a bulk sample of another material, with no fixed ratio of the components.[4] Id. From this distinction Warner–Lambert maintains that one skilled in the art would conclude that "hydrochloride admixture" means hydrochloric acid itself.

Warner–Lambert points to the deposition testimony of Dr. Herrmann, one of the '482 patent inventors. Dr. Herrmann explains that HCl is a compound that should not be a part of gabapentin, so it may be called an admixture or an impurity. Hermann Dep. at 50, l. 15, ll. 25–51.

Warner–Lambert also relies on the file history. In Warner–Lambert's fourth application, the '482 inventors included a "20 ppm" limitation that tracked the language found at Column 5, lines 18–29 of the '482 patent. Ratliff Decl., Ex. 16, April 8, 1992 Preliminary Amendment at 1, 2. Application Claim 10, which ultimately became claim 3 of the '482 patent, stated "wherein the proportion of remaining mineral acid admixtures does not exceed 20 ppm." Id. The term "mineral acid admixtures," according to Warner Lambert, is synonymous with the term "hydrochloride admixtures" found in the '482 patent specification.

The Examiner felt that the term "mineral acid admixtures" was ambiguous, and

---

4. Purepac argues that nowhere in the definition of admixture does it appear that there is "no fixed ratio of the components." Rply. at 23. While that may be true, the Court does not understand Warner–Lambert's argument to suggest that the definition of admixture includes those specific words. Rather, Warner–Lambert seems to be contrasting the general concept of admixture with the specificity of a 1–to–1 ratio of HCl and gabapentin in gabapentin hydrochloride.

inquired as to whether the term referred to the presence of mineral acid per se or to the mineral acid addition salt. *Id.* The response from the inventors was that the remaining amounts of mineral acid were responsible for stability problems. A declaration by Dr. Herrmann stated that the instability of prior art products could be avoided if the "HCl content" is reduced to 20 ppm. However, the inventors amended application Claim 10 to read "wherein the proportion of remaining mineral acid addition salt does not exceed 20 ppm." Ratliff Decl., Ex. 19, Jan. 5, 1994 Amendment at 1–3. According to Warner–Lambert, that claim amendment represents a misunderstanding on the part of the inventors' attorney because the term "mineral acid addition salt" refers to gabapentin hydrochloride and not to the leftover mineral acid. Dep. Tr. of Dr. Bartlett at 174, ll. 19–176, l. 12. Defendants rely heavily on this situation and argue this was no "misunderstanding."

Another supposed mistake on counsel's part was writing that Dr. Herrmann's Declaration evidenced the fact that gabapentin prepared according to the Satzinger patent contained a mineral acid addition salt content of 200 ppm. Jan. 5, 1994 Amendment at 7. Here again, Warner–Lambert claims that this statement is incorrect and is inconsistent with Dr. Herrmann's Declaration which states that the prior art product ("Satzinger") has a HCl content of 200 ppm (measured by chloride ion content). Warner–Lambert's position is borne out by the Herrmann Declaration insofar as he states that the "200 ppm" refers to residual mineral acid, not gabapentin hydrochloride.

Thus, it appears that Warner–Lambert's position is supported by Dr. Herrmann's Declaration, but not by the writings authored by its attorney. It is true that there is nothing in the record, other than Warner–Lambert's briefing, to directly support its position that the attorney misunderstood the situation. But there is still a question of fact to be resolved.

At an interview with the Examiner on January 24, 1994, Warner–Lambert presented corrected claim language and the inventors agreed to limit all claims to "20 ppm of Cl$^{\ominus}$." The inventors' next submission to the Patent Office revised the language of application Claim 10 to "wherein the proportion of remaining anion of a mineral acid does not exceed 20 ppm." The inventors added a limitation of "less than 20 ppm of an anion of a mineral acid" to application Claims 1 and 8. The inventors referred the Examiner to the specification as support for these claim revisions and, in particular, to the statement that "the proportion of remaining hydrochloride admixtures should thereby not exceed 20 ppm." *Id.* at 6, Ratliff Decl., Ex. 22. The examiner did not question that support and promptly issued an allowance. *Cf. Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1574–75 (Fed. Cir.1992) (" '[T]he fact that the Patent Office allows ... an amendment without objection thereto as new matter ... is entitled to an especially weighty presumption of correctness.' ") (citation omitted).

Next, Warner–Lambert points to pre-litigation interpretations by Teva scientists which are consistent with Warner–Lambert's position. Dr. Claude Singer reviewed gabapentin literature in 1995 and 1997, including the '482 patent's European counterpart. He concluded, as one skilled in the art, that it was acid, and not gabapentin hydrochloride, that had the undesirable catalytic effect. Thus, Dr. Singer was not misled or confused by the reference to "hydrochloride admixtures."

Dr. Michael Pesachovich of Teva also made it clear that he did not believe, in 1997, that the '482 invention was speaking

about measuring the gabapentin hydrochloride levels.

In addition, Warner–Lambert points out that if the words in the specification meant what Defendants now say they mean, then the inventors of the '482 patent would have described their invention in a manner that could not even be tested or determined using analytical techniques available at the time of the invention. This is so because if the inventors had elected to measure gabapentin hydrochloride, that would have required the inventors to measure samples to see if they contained more than 3.4 ppm chloride and, if they did, to reject those samples. This interpretation is strained because the inventors could not measure chloride in such low amounts accurately and, it is argued, anyone skilled in the art at the time of the invention would have known that such a requirement was impractical. Warner–Lambert thus stresses that it would be unreasonable to assume that the inventors would have described their invention that way.

Evidence in the record, including, but not limited to, conflicting expert affidavits, presents a quintessential disputed issue of fact as to whether the claims of the '482 patent are supported by the written description. A reasonable fact-finder could conclude that one skilled in the art would discern that it is the hydrochloric acid that the inventors discovered was detrimental to gabapentin, it is the hydrochloric acid that the inventors knew they could measure directly by measuring the amount of chloride ion ($Cl^{\ominus}$) in the sample, and it is the hydrochloric acid amount or level that is central to determining whether the claim limitation has been met. If the fact-finder did so conclude, the written description requirement would be met. Summary judgment invalidating the '482 patent for failure to comply with the written description requirement is thus inappropriate.

## CONCLUSION

For the foregoing reasons, the Motions of Defendants for summary judgment invalidating claims of the '482 patent for failure to comply with the written description requirement of 35 U.S.C. § 112, ¶ 1 is denied.

Accordingly, **IT IS** on this 22nd day of August 2005,

**ORDERED** that the Motion of Defendants Purepac Pharmaceutical Co. and Faulding Inc., and the Joint Motion of Defendants Apotex Corp., Apotex, Inc., TorPharm, Inc., Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries, Ltd., Eon Labs Manufacturing, Inc., Zenith Laboratories, Inc., Zenith Goldline Pharmaceuticals, Inc., and Ivax Corporation for summary judgment invalidating the claims of U.S. Patent No. 6,054,482 for failure to comply with the written description requirement of 35 U.S.C. § 112, ¶ 1 is denied.